1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-00401-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   MATTER OF CERTAIN CLAIMS AND NOTICING AGENTS,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                  United States Bankruptcy Court

12                  One Bowling Green

13                  New York, NY  10004

14

15                  November 17, 2022

16                  3:00 p.m.

17

18

19

20

21  B E F O R E :

22  HON MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  JONATHAN

1   HEARING re In Courtroom hearing to Determine Sanctions. (Doc

2   ## 19, 20, 28, 29, 36, 37 to 44)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   LEVENFELD PEARLSTEIN LLC

 4        Attorneys for Epiq Corporate Restructuring LLC

 5        2 N. LaSalle Street, Suite 1300

 6        Chicago, NY 60602

 7

 8   BY:  JACK R. O'CONNOR

 9

10   PAUL, WEISS, RIFKIND, WHARTON GARRISON LLP

11        Attorneys for Omni Agent Solutions

12        1285 Avenue of the Americas

13        New York, NY 10019

14

15   BY:  WILLIAM CLAREMAN

16        ALEXANDER WOLVERTON

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19        Attorneys for the U.S. Trustee

20        201 Varick Street, Suite 1006

21        New York, NY 10014

22

23   BY:  ANNIE WELLS

24        ANDREA SCHWARTZ

25        ANDY VELEZ-RIVERA
```

1   DAVIS POLK WARDWELL LLP

2        Attorneys for Donlin, Recano and Co.

3        450 Lexington Avenue

4        New York, NY 10017

5

6   BY:  ELLIOT MOSKOWITZ

7

8   JENNER BLOCK LLP

9        Attorneys for Stretto, Inc.

10        1155 Avenue of the Americas

11        New York, NY 10036

12

13   BY:  RICHARD LEVIN

14

15   ALSO PRESENT:

16   TINAMARIE A. FEIL

17   ANDREW GLANTZ

18   CHRISTOPHER UPDIKE

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2              CLERK:  All right, starting the recording for

3     November 17th, 2022, at 3 p.m., calling the Matter of

4     Certain Claims and Noticing Agents, Case Number 22-401.  If,

5     one at a time the parties, in the courtroom could please

6     state their name and who they represent that would be

7     appreciated.

8              MR. O'CONNOR:  Good afternoon.  This is Jack

9     O'Connor of Levenfeld Pearlstein, LLC on behalf of Epiq

10    Corporate Restructuring, LLC.

11             CLERK:  Okay.  Anyone else on behalf of Epiq?

12             MR. O'CONNOR:  No.

13             CLERK:  Okay, thank you.  Is there anyone else on

14    the phone that's speaking on behalf of Epiq?

15             MR. O'CONNOR:  No.

16             CLERK:  Okay, confirming.  Thank you.  All right,

17    next.

18             MR. MOSKOWITZ:  Good afternoon, Elliott Moskowitz

19    from the law firm Davis Polk and Wardwell representing

20    Donlin, Recano and Company, Inc.

21             CLERK:  Okay.  Is there anyone else from -- that

22    will be representing that firm?

23             MR. MOSKOWITZ:  No one else that will be speaking,

24    neither in person or on the phone.

25             CLERK:  Thank you.

1          MR. MOSKOWITZ:  Thank you.

2          CLERK:  Are there additional parties?  You can

3   come to the, to the podium and please state your appearance.

4          MR. CLAREMAN:  Good afternoon, Billy Clareman from

5   Paul Weiss on behalf of Omni Agent Solutions.

6          CLERK:  Okay.  Anyone else?

7          MR. CLAREMAN:  I'm joined in the courtroom by

8   Alexander Wolverton, also from Paul Weiss.

9          CLERK:  Thank you.

10          MS. FEIL:  Good afternoon, Tinamarie Feil from BMC

11   Group Claims Agent, unrepresented at this time.

12          CLERK:  Okay, thank you.

13          MS. WEINER:  Good afternoon.  Shira Weiner, Kroll

14   Restructuring Administration.  Thank you.

15          CLERK:  Thank you.

16          MS. WELLS:  Good afternoon, Annie Wells on behalf

17   of the United States Trustee.  And with me in the courtroom

18   today, I'm joined by my colleagues Andrea Schwartz and Andy

19   Velez-Rivera.  Thank you.

20          CLERK:  Thanks.  Is there anyone else that will be

21   in the courtroom that will be speaking this afternoon and

22   has not given their appearance at this time?  All right.  Is

23   there anyone on the phone that will be speaking this

24   afternoon and has not given their appearance yet?

25          MAN 1:  Hi, there's one more in the courtroom.

1          CLERK:  Sure.  Go ahead.

2          MR. UPDIKE:  Chris Updike, general counsel for

3     Stretto.  We're being represented by Rich Levin from the law

4     firm Jenner Block.

5          CLERK:  All right.  Thank you.  All right.  You

6     can pause the recording for now.  I'll be back on in a few

7     moments.

8          (Pause)

9          THE COURT:  Good afternoon.  Good afternoon,

10    everyone.  We're here in miscellaneous matter, Matter of

11    Certain Claims and Noticing Agents, 22-00401.  Has everybody

12    in the courtroom made their appearances already?  That's

13    fine.  All right.  Let me make some preliminary comments

14    before we go further.

15         So as I understand it, there's a discovery dispute

16    between the Office of the United States Trustee and the

17    claims agents.  I want to deal with that issue first.  I

18    will tell you what my preliminary views are, subject to

19    being persuaded otherwise, is that, you know, I'm starting

20    out believing that the Office of the U.S. Trustee is

21    entitled to the additional discovery that it wishes to take.

22    And that until that discovery is completed, I would, I

23    probably will not rule on what, if any, sanctions or other

24    remedies should be imposed by the Court.

25         The second thing would be that the appeal of Judge

1    Lane's ruling in Madison Boys and Girls Club is pending

2    before Judge Failla in the district court.  And my

3    inclination is to await any ruling until that appeal is

4    resolved.  Obviously, if Judge Failla reverses, depending on

5    what grounds she were to reverse, it might moot this

6    proceeding.  It might not.  But I don't know what her --

7    maybe some of you know what her timing, whether there was a

8    briefing schedule.  I don't know, I don't know what's

9    happening with that.  Ms. Schwartz --

10           MS. SCHWARTZ:  Yes, Judge, thank you.  Andrea

11    Schwartz for the U.S. Trustee.  Judge, I think it was just

12    recently, a couple of days ago, or definitely recently that

13    there was an amended list of the items from the docket, you

14    know, that were important to the appeal.  And I don't even

15    think the documents have been yet sent to the district

16    court.  So we're not even at a counter designation of

17    documents and so forth.  So it's pretty far off at this

18    point.

19           THE COURT:  I'm certainly well -- so we're going

20    to have to deal with the discovery issues first.  Then, and

21    I'll certainly hear the views of counsel as to whether you

22    think I ought to hold off taking any -- even once the

23    discovery is all resolved, taking any action until Judge

24    Failla has completed whatever she's going to do with the

25    appeal.  Obviously, Judge Lane's decision is a central

1    component of the reasons that I went forward with the

2    miscellaneous proceeding.

3            So dealing with discovery issues first, let me

4    hear first from lawyers for the U.S. Trustee's Office about

5    the discovery that they wish to take and why.  Welcome to

6    the courtroom.  We haven't had very many hybrid hearings as

7    we're having today.  It's nice to have -- I had a hybrid

8    hearing a few weeks ago but it's been very hard to get

9    people to come into the court unless I ordered it.  Go

10   ahead.

11           MS. WELLS:  Good afternoon.  Again for the record,

12   Annie Wells on behalf of the United States Trustee.  It is

13   nice, I just want to start by saying, to be in court and

14   actually on a personal note, this this is probably --

15   actually the last hearing before the miscellaneous

16   proceeding was --

17           THE COURT:  A little louder.

18           MS. WELLS:  -- was probably my first.  But since I

19   only recently joined the program, this is actually my second

20   in-person hearing.

21           THE COURT:  Nice to have you here, Ms. Wells.

22           MS. WELLS:  Thank you so much, Judge.  So if I

23   understood Your Honor correctly, in dealing with the

24   discovery request, I do want to start actually by a quick

25   update, if you will.  We actually did have a conversation

1    with counsel for one of the claims agents concerning the

2    request, the requested documents. And we had some informal

3    discussions and we had some, I think, positive response --

4    and I'll get to the others too -- in terms of getting some

5    of the documents that we had wanted to see. Although this

6    development took place very recently, we haven't had a

7    chance yet to go through what was sent, which takes me back

8    to, in terms of update, you know, the -- as we noted in our

9    response, I think the only claims agent that at least on the

10    record had taken issue with what we had requested was Epiq.

11    And so obviously, we'd want to know what their position is

12    today, but it seemed to us and we were trying to address

13    their arguments against producing the documents or giving

14    the documents and also in -- or maybe I should just back up.

15         In our request, we had requested, I think, a list

16    of cases in which the claims agent had acted not only as

17    156(c) agents, but also in other capacities including, for

18    example, you know, balloting consultants or distribution

19    agents or keeping track of the schedules and financial

20    records for the Debtor, in other words either under 327 or

21    if they were doing work for Committee, 1104, and we wanted

22    some of the information pertaining to that because what was

23    previously produced or provided in this proceeding was

24    really limited to the 156 documents that was in Your Honor's

25    initial order.

1          THE COURT:  I have your letter of October 18th,

2     2022, EFF Docket Number 28.

3          MS. WELLS:  Okay.

4          THE COURT:  And on Page 3 of the letter, you --

5     the first full paragraph and continuing on to the next page,

6     so it starts on Page 3 -- you cataloged what additional

7     discovery you were seeking.

8          MS. WELLS:  Correct.

9          THE COURT:  And so have you resolved with any of

10    the claims agents any of the specific items or have you

11    narrowed any of the requests that you were making?

12         MS. WELLS:  We have not.

13         THE COURT:  Okay.

14         MS. WELLS:  Like I said, we had a preliminary

15    discussion with one of the claims agents.  It wasn't

16    specific to, you know, what was going to be any kind of a

17    limit.  But I think we were trying to start the conversation

18    going and giving us some documents to see where we go from

19    there.  And again, I apologize because this was as late as

20    yesterday afternoon.  We really did not have a chance to go

21    through it in any detail, but no other claims agent -- and,

22    in fact, it's clear that Epiq is not that one in terms of

23    responding to what we had noted in Docket Number 28.

24         THE COURT:  Well let me, for the benefit of all of

25    you in shaping your arguments, I haven't resolved this yet.

 1    But in terms of my own thinking about it, it seems to me

 2    that the conduct of the claims agents in districts other

 3    than the Southern District of New York, in terms of their

 4    engagements under 156(c) and whether -- which of those

 5    retentions occurred after they had an agreement with XCLAIM,

 6    it's relevant to me and to the other judges in the Southern

 7    District Bankruptcy Court in deciding whether or not to

 8    approve a retention of a claims agent in a case here,

 9    whether they made what we believe to be required disclosures

10    or prohibited relationships under 156(c), what they did

11    elsewhere.  If I have to decide whether to approve a

12    retention of Epiq, I want to know whether Epiq had an

13    exclusive arrangement with XCLAIM for a case in Delaware or

14    New Jersey or anywhere else in the United States and whether

15    they received compensation from XCLAIM in connection with

16    that relationship.  It may be if the U.S. Trustee wants to

17    seek disgorgement of amounts that were obtained in another

18    district, the U.S. Trustee can go and seek it from a judge

19    who had the case before him or her, but that it's relevant

20    to me and my colleagues to know when we're asked to approve

21    a retention of Epiq or another claims agent, how many and

22    when and how much they received for what was believed to be

23    an improper relationship.  I focus on the exclusive

24    relationship because I think that raised additional problems

25    once those agreements were altered to take away the

1    exclusivity, but I think there was still a problem with it.

2         So I -- it does seem the discovery that you were

3    seeking that you outlined in ECF Docket 28, that letter --

4    and I will listen to argument -- seems relevant to me to a

5    decision of a judge in this court whether or not to approve

6    or attention whether it's Epiq, Stretto, or, you know, Kroll

7    said they didn't have a relationship with XCLAIM.

8         So that's my mindset going into this argument

9    based on a review of everything that's been filed, is that

10    yeah, it may have happened somewhere in a district other

11    than New York, but it matters.  It matters to my evaluation

12    of whether or not to approve a retention.  If Epiq received

13    compensation from XCLAIM in Delaware, it raises the question

14    whether they were a disinterested party, and that's relevant

15    to me.  It may be that for whatever reason I'll decide,

16    okay, that's the past.  It may go into what, if any,

17    sanctions should be imposed?

18         What I read the statute and our guidelines, those

19    sanctions can include removing any of the claims agents from

20    our approved list.  Okay, So let me start with that.  So

21    that's, that's sort of going into it.  I've made up my mind

22    finally, but that's how I'm approaching it at the start.  It

23    does seem to me that relevance arguments aren't going to

24    carry the day because it all seems relevant to me to the

25    decision of whether a judge in this court approves the

1   retention.  Go ahead.

2         MS. WELLS:  Thank you, Your Honor.  So I think

3   that actually segues into something that I was going to

4   address in the beginning, which is in relaying the update

5   that hadn't gotten a response from one of the claims agent

6   but tying it to I guess the context of this proceeding.

7         The letter that we put in at 28 was at the Court's

8   request to indicate what additional information is needed

9   for the record of the miscellaneous proceeding.  So I think

10  from our view, we want to be clear that even to the extent

11  that things may be provided to us on a voluntary basis, I

12  think it's important to make sure that it makes its way to

13  the record of the miscellaneous proceeding precisely for the

14  reason that Your Honor had explain, which is also to assist

15  the judges of this court in this proceeding to determine,

16  you know, sort of the extent of the fees, the extent of the

17  involvement, sort of the procedural history of the

18  relationship.

19        So, you know, I think ideally just in terms of

20  logistics and formality and making sure things are tied up,

21  we would want to see something on the miscellaneous

22  proceeding docket in terms of what is to be produced and

23  supplemented for the record rather than just simply saying,

24  you know, haphazardly, some agents gave us this and other

25  agents gave us that.  So I just want to --

1          THE COURT:  The outcome, if I order -- make an

2     order that you get the discovery you're seeking, it's going

3     to apply to all the claims agents, it's not, it's not a

4     voluntary issue.

5          MS. WELLS:  Okay, thank you, Judge.  So that takes

6     to this me to the second point, which is aside from

7     relevance, I think one of the other arguments that Epiq had

8     made was that producing the information or gathering the

9     information may be burdensome for them.  And also I think,

10    I'll just state it matter-of-factly and not necessarily

11    casting any kind of characterization, you know, the

12    information is out there.  Meaning, you know, in every case

13    where we've been retained, we filed an application, we've

14    set forth our fees, so you can go find it.

15          THE COURT:  It's all a public record.  The

16    retentions are all, there's an order approving the

17    retention.  When their fees are awarded, there's an order.

18    There's an application, there's an order.

19          MS. WELLS:  Right.

20          THE COURT:  They are public records.  The issue is

21    burden.  You know, somebody's really got to persuade me

22    about what the burden is.  It doesn't, it doesn't, I don't

23    see the burden.

24          MS. WELLS:  We did -- a little birdy did remind me

25    that in giving the update, you know, when I said that the

1    developments we had with one of the claims agent, we were

2    able to get, you know, a lot of information in, I think not

3    a lot of time, this was recent, but still I think that would

4    go towards the burden.  I mean obviously the other claims

5    agents will come up and let Your Honor know how burdensome

6    it is to them.  But I would argue, I would submit that the

7    fact that some of this information is already out there and

8    I'm sure they're already keeping track of it, it can't be,

9    you know, most respectfully, I'm not convinced that it's

10    terribly burdensome.

11          THE COURT:  You know Epiq disclosed that in cases

12    here, they received $7556.43 in fees earned from XCLAIM;

13    Stretto, $17,050.30; Donlin Recano, $2,115.28; Omni Agent

14    Solutions, $1,062.50.  It's public information.  They have

15    to have their files that show this is the retention order.

16    This is our fee application.  This is what the court

17    approved.  At the time we did that, we had a contract with

18    XCLAIM.  We had did not publicly disclose that fact.  I'm

19    not so sure what's -- where's the burden.

20          MS. WELLS:  And I would also add that in

21    formulating the requested documents that we had, we did, we

22    tried to sort of mirror or be coterminous in terms of the

23    information.  For example, the five year span, I believe was

24    also I think in the miscellaneous proceeding order initially

25    in terms of the look-back period.  Obviously if, if someone

 1   wants to come back and say, you know, it doesn't go back

 2   that far because XCLAIM didn't come on the scene until,

 3   whatever, 2018, you know, we're happy to talk about it.

 4          THE COURT:  You ought to be able to work that out.

 5          MS. WELLS:  Right, we're happy to talk about it.

 6   I think we simply wanted to be complete and comprehensive

 7   and making sure that we captured, you know, if there were

 8   precursors to XCLAIM or other similar types of arrangements

 9   with other parties, we wanted to be comprehensive in what we

10   sought, but we were trying to be, you know, cognizant of the

11   burden we would impose in our request.

12          So I don't know that I have much else to say

13   unless Your Honor has questions for us as to why we

14   requested what we requested or if the other parties want to

15   --

16          MS. SCHWARTZ:  Judge, can I just mention one

17   thing?

18          THE COURT:  Sure, Ms. Schwartz, go ahead.  Go

19   ahead.

20          MS. SCHWARTZ:  Okay.  Your Honor, one thing when

21   you were asking about disclosure of the fee --

22          THE COURT:  Make your appearance.

23          MS. SCHWARTZ:  Oh, Andrea Schwartz for the United

24   States Trustee, when you were talking about disclosure of

25   the fees, one of our request was the fees that were earned

1  in the cases, not just disclosure of the XCLAIM.  I just

2  wanted to clarify that.

3           THE COURT:  No, I understand that.  What I said --

4           MS. SCHWARTZ:  When we're talking about the burden

5  --

6           THE COURT:  Yeah.  There is going to be an order

7  that approved the fees of the agent in whatever the case

8  was.

9           MS. SCHWARTZ:  Right.

10           THE COURT:  Go ahead.

11           MS. WELLS:  And again, I don't think the answer

12  is, well since it's out there, you know, you can certainly

13  go pull it --

14           THE COURT:  Go find it.

15           MS. WELLS:  Yeah, Your Honor, scour the dockets

16  and cobble that information together.

17           THE COURT:  Okay.

18           MS. WELLS:  In any event, like I said, unless Your

19  Honor has other questions, I'm happy to sit down.

20           THE COURT:  For now, that's it.  Okay?

21           MS. WELLS:  Thank you, Judge.

22           THE COURT:  Who's going to argue first for -- Mr.

23  Levin.

24           MR. LEVIN:  Good afternoon, Your Honor, Richard

25  Levin, Jenner and Block for great Stretto.  It's great being

1  back here, but this is a little strange.  For Stretto, Your

2  Honor, and I suspect for the other claims agents as well, we

3  don't have any trouble putting together this information for

4  the U.S. Trustee.  I would say that we didn't do it to date

5  because the U.S. Trustee filed this -- you ordered that they

6  file what they wanted and we were waiting to hear from the

7  Court, do we need to do this or do we not need to do this?

8  It wasn't like we were refusing.  I have to admit there's

9  some irony here in that they're asking us to reformat

10  publicly information -- publicly available information in a

11  format that's more usable for them, but we can do it.

12           THE COURT:  You can, probably pretty easily too.

13           MR. LEVIN:  Probably pretty easily.  It probably

14  wouldn't take the technology that was necessary to deal with

15  the claims registers --

16           THE COURT:  You might have the information

17  already, Mr. Levin.

18           MR. LEVIN:  Some of our clients have probably

19  assembled it.  And as you know, it's all in the public

20  record.  Not only -- I mean we've already provided it and

21  Item A certainly has been provided in the public record.

22  And Item B has as well.  The only thing that's missing is

23  Item C.  And each of the claims agents designated a person

24  by filing a declaration.  So, in effect, the thing on Page 4

25  --

1              THE COURT:  They ask for the name of a

2     representative.

3              MR. LEVIN:  Yes, exactly.

4              THE COURT:  Whether it's the person you designated

5     or not, you can just tell them.

6              MR. LEVIN:  But I want to make two other points

7     about what the Court said at the opening.  One is that it

8     might be relevant to dealing with whether to approve a

9     retention in another case.  I don't dispute that at all.

10    But ordinarily, that information would have to be disclosed

11    in that case, not in a miscellaneous proceeding.  And so I

12    don't know that that is a reason to -- I mean there may be

13    other reasons to disclose it here, but that's not a reason

14    in this proceeding.

15             THE COURT:  Well, let me ask you this, Mr. Levin.

16    Did -- your client had a contract with XCLAIM?

17             MR. LEVIN:  Correct.

18             THE COURT:  Did it ever, before the Madison Boys

19    and Girls Club, had it ever disclosed the existence of that

20    contract in any of its retention applications?

21             MR. LEVIN:  No.

22             THE COURT:  That's the point.

23             MR. LEVIN:  But at this point, Your Honor, I think

24    --

25             THE COURT:  Well, everybody is terminated if their

1  contract was with XCLAIM.

2         MR. LEVIN:  Well, not only that, but if they were

3  ever to have another one, this issue is very present and it

4  was something the U.S. Trustee would request in every case

5  where a claims agent is going to be hired.  And it's

6  probably something the Court would request as well.

7         THE COURT:  Well, if we had known about it, we

8  would have asked.  Okay?

9         MR. LEVIN:  We can get it, that's a separate

10  topic.

11         THE COURT:  We didn't know.  You know, Mr. Levin,

12  look, let me speak for myself.  Okay?  I had no clue about

13  the existence of any compensation arrangement with XCLAIM.

14  It just never even crossed my mind.

15         MR. LEVIN:  I'm aware.  Others did.  But that's

16  not the issue here.  So we won't address that right now.

17  The other thing I wanted to mention, Your Honor, is you're

18  talking about delaying rulings and I understand you want a

19  complete record.  I can tell you what is happening in the

20  industry right now.  These agents who had contracts with

21  XCLAIM are being told -- or at least my client is being told

22  at least once and maybe again that they are being passed

23  over for consideration for future matters because of the

24  overhang of this.  And therefore, they are quite eager to

25  get this resolved as quick as possible.  And if we have to

1   wait for the appeal, we could be talking a year or a year

2   and a half.  And our position in the papers that we took,

3   Your Honor, is that whatever the compensation was that the

4   U.S. Trustee wants to know, the standard for sanctions is

5   pretty well laid out and can be decided on the existing

6   record as to whether there should, whether there should be

7   any sanctions.  I suspect that the U.S. Trustee's

8   information request as to fees received in 327 and 120 --

9   156 retentions goes, perhaps, to if there are to be

10  sanctions, what the amount of the sanctions should be.  But

11  they don't go to the question of whether there should be

12  sanctions, which I think is adequately addressed in the

13  papers.  And at least my client is quite eager for this

14  Court to put this matter to rest.  We think we stand on firm

15  ground in what has happened and we don't want to see a delay

16  of a year or year and a half.  It could be extremely

17  detrimental to the business of all five claims agents who

18  are here today.  I'd like the court to take that into

19  consideration.

20          THE COURT:  The reason I raised the issue about, I

21  think, two issues; one, I will await the completion of the

22  record being supplemented.  Okay.  But I'm raising the issue

23  about awaiting an appeal.  I'm not advocating necessarily to

24  await a decision by the district court.  I wanted to put

25  that out to get the views of counsel on that.  You make a

1    persuasive argument why the Court shouldn't wait for the

2    district court to decide.

3              MR. LEVIN:  Thank you.

4              THE COURT:  You know if the district court

5    reverses whether I've awarded sanctions -- but please

6    understand, you may disagree with this, but we're going to

7    get this out there.  A potential sanction is to remove a

8    claims agent from the approved list for the district.  It's

9    not -- the range of potential sanctions is not just dollars.

10             MR. LEVIN:  We understand that, Your Honor.  The

11   thought has crossed our mind, not happily I should add.

12             THE COURT:  I don't -- by raising that, I am not

13   suggesting that's what the Court is going to do at the end

14   of the day.

15             MR. LEVIN:  And because you're not currently

16   suggesting that, I won't attempt to address that point, but

17   believe me, I will be in a position to address it if it does

18   come up.

19             THE COURT:  Let me put it this way, Mr. Levin.

20   When the record is complete, you'll have -- you or anybody

21   else -- would have a chance.  I'm not going to simply rule

22   on the papers and decide that.  You will and your colleagues

23   will have a chance to address that issue.  Okay.

24             MR. LEVIN:  May I --

25             THE COURT:  Part of my -- let me just say this.

1    So Stretto, in this district at least, Stretto's fees earned

2    were low.  You know, were more than --

3            MR. LEVIN:  Although you said Stretto he had

4    received that much, they hadn't, Your Honor.  They received

5    7000 and change.

6            THE COURT:  Okay.

7            MR. LEVIN:  And accrued the balance and then

8    waived it.

9            THE COURT:  All right.

10           MR. LEVIN:  So they haven't received that much.

11           THE COURT:  Look, I don't know -- You could argue

12   and maybe you'll argue if there was a lot of money in

13   Delaware that they received, that the Court shouldn't take

14   that into account.  But that's -- the dollars aren't huge.

15           MR. LEVIN:  Your Honor, those dollars are all

16   courts, not just New York.  That's 17,000 is all cases.

17           THE COURT:  Okay.  Look, I understand your

18   argument about not waiting, that there's a good legal and

19   business reason for not awaiting -- I'm not trying to

20   prolong uncertainty in the marketplace.  Okay?  That's not

21   my goal.

22           MR. LEVIN:  Okay.  May make one other point, Your

23   Honor --

24           THE COURT:  Go ahead.

25           MR. LEVIN:  -- about the information.  You keep

1   referring to it as discovering.  The United States Trustee

2   wrote the letter to the Court in response to the Court's

3   order that it say whether additional information was

4   required.  We didn't consider that to be a discovery

5   request.  Had they served discovery, we would have responded

6   in kind.  And I think what the U.S. Trustee is asking for is

7   not discovery, which does not become part of the record in

8   the case, but rather a filing in the case that does become

9   part of the record.  And I think we should address it in

10  those terms so that we don't import all the discovery rules

11  into this.

12          THE COURT:  Okay.  So look, Judge Lane ruled.

13          MR. LEVIN:  He did.

14          THE COURT:  And I was certainly -- all of my

15  colleagues were aware of the pendency of the issues in

16  Madison Boys and Girls.  It was a decision by Judge Lane.

17  We were all fully cognizant of it.  He ruled.  Shortly

18  thereafter, the miscellaneous proceeding was opened.  I, as

19  the chief judge, made the decision to do that, but I will

20  tell you I conferred with my colleagues about it and we

21  thought this was an important issue for the district.  Okay.

22  And hence the miscellaneous proceeding.  We don't have --

23  just to be clear -- I'll speak for myself.  I don't have a

24  particular gripe with any of the claims agents.  They serve

25  a very important function for the bankruptcy system for this

1    court.  Claims trading, despite the very early cases that

2    raised questions about it, I think it's a, a socially

3    useful, important function, provides liquidity in the

4    marketplace.  That's not the issue.  I mean, XCLAIM somehow

5    thinks that were anti-claims trading.  We're not; I'm not.

6    It's the way they went about it.  Okay.  I'll listen to

7    anybody else whether they say, oh, no, wait.  But you know,

8    when I say wait for the decision, I wanted to put out, Look,

9    we're all aware that there is an appeal before Judge Failla.

10   I'm happy to go ahead and decide it before that.  I'd like a

11   full record here.

12          It was obviously purposeful on my part for asking

13   the U.S. Trustee to state what their position is.  This is

14   an adversary process in this court and this, this isn't

15   Judge Glenn against the industry.  Okay.  And so yes, the

16   order instituting the proceeding said what we wanted then,

17   but we wanted to hear from the U.S. Trustee.  If the U.S.

18   Trustee had said we think this is all just fine, that would

19   have weighed heavily in our -- in my decision about what to

20   do I think.

21          MR. LEVIN:  You say this is an adversary process

22   and we understand that.  And we don't expect the Court to be

23   our adversary.

24          THE COURT:  It's not.

25          MR. LEVIN:  So we would expect at this point that

1  if there is any adversary in this -- and I don't mean to

2  cast them in an adversarial light -- it would be the U.S.

3  Trustee.

4              THE COURT:  Agreed.

5              MR. LEVIN:  It's nice to know who our opponent is,

6  Your Honor.  We weren't sure about that at the beginning.

7              THE COURT:  I don't necessarily call them an

8  opponent because the claims agents play such an important

9  function for the court.  We couldn't survive without it.

10             MR. LEVIN:  An opponent in the sense of if you

11  have an adversary proceeding, there's one on each side.  We

12  didn't have clarity on who was on the other side.

13             THE COURT:  I don't believe, you knew exactly who

14  was on the other side.

15             MS. WELLS:  And it's not only one against one,

16  Your Honor.  We're often one against 50.

17             MR. LEVIN:  Well, we're only five, Your Honor.

18             THE COURT:  Yeah, well.  All right.  Anything

19  else, Mr. Levin?

20             MR. LEVIN:  I think that's it, Your Honor.  I want

21  to defer to my colleagues on what they want to say.

22             MS. WELLS:  Umm --

23             THE COURT:  Hang on, Ms. Wells.  We'll give

24  everybody who wants to speak on the other side a chance.  I

25  also -- let me say, I don't know who Mr. Wolverton

1   represents, but I always -- and I'm not sure whether he's

2   appeared before me.  He hasn't.  He's shaking his head no.

3   But whenever one of my former law clerks appears for the

4   first time in a matter before me, I always say that

5   Alexander Wolverton is a former law, you know, whatever, is

6   a former law clerk and is appeared before me currently.  So

7   in any event.  Go ahead.

8           MR. O'CONNOR:  So, good afternoon, Your Honor.

9   Jack O'Connor from Levenfeld Pearlstein, LLC, on behalf of

10  Epiq Corporate Restructuring, LLC.  I just want to layer

11  over a couple of points that Mr. Levin made and address a

12  couple that were not addressed in response to the U.S.

13  Trustee's comments.

14          The first is the Court's concern over exclusivity

15  with these agreements.  Despite the fact that Epiq had what

16  was called an exclusive agreement with XCLAIM, it was never

17  --

18          THE COURT:  I don't call it an exclusive

19  agreement.  I've read it.  It was an exclusive agreement.

20          MR. O'CONNOR:  Yes.  But the intent was never to

21  make it an exclude relationship.

22          THE COURT:  It sure read that way.

23          MR. O'CONNOR:  Yes.  Which is why it was corrected

24  and superseded.

25          THE COURT:  I was going to ask you.  If Epiq

1   believed that the arrangements would XCLAIM were proper,

2   then why on June 24th, 2022, did it enter into a new

3   agreement with XCLAIM to exclude the exclusivity provision?

4          MR. O'CONNOR:  It was specifically for the purpose

5   to make sure that the intent of the agreement was followed,

6   Your Honor.  At the beginning of the relationship, it may

7   have been deemed, you know, titled "exclusive agreement,"

8   but that wasn't the intention of the parties.

9          With respect to the burden that the U.S. Trustee

10  spent a good amount of time speaking to, we agree this is

11  not particularly burdensome to be able to produce this

12  information.  We took issue with the fact that there was a

13  five year look-back period requested given the fact that at

14  least from Epiq's standpoint, they've only been dealing with

15  XCLAIM for the last three years.  So looking back further

16  than that --

17         THE COURT:  It makes it easier.  You won't have to

18  disclose anything for the two years before that.

19         MR. O'CONNOR:  Yes, Your Honor.  But as Mr. Levin

20  stated, we weren't sure what the Court would rule on this

21  issue which is why we raised our objection as quickly as we

22  did initially.  I want to stress the problems with delay in

23  this matter though.

24         As Mr. Levin said, the claims agents are

25  experiencing problems in the marketplace over this

1   proceeding.  Epiq has informed me that in at least one major

2   pitch, they were told that this proceeding was the reason

3   why they were not hired.  And we can't have that continue.

4   The cloud that is hanging over these claims agents is

5   unnecessary and we don't think that there's been any,

6   anything but good faith actions and that's why we're here

7   today.

8              THE COURT:  So let me ask you this.

9              MR. O'CONNOR:  Yes.

10             THE COURT:  Judge Lane's retention order in

11  Madison Square was signed on July 29th.  Epiq's disclosure,

12  which is ECF Docket 12 in this case, at Paragraph 16 states

13  that "Epiq ceased providing data to XCLAIM in the Madison

14  Square case on August 17th, 2022."  Did Epiq violate Judge

15  Lane's order between July 29th and August 17th?

16             MR. O'CONNOR:  I do not know, Your Honor.  What I

17  do know is as soon as Epiq was able to, it shut off access.

18             THE COURT:  Well, no, I don't think -- that's not

19  an answer.  So you need to file a letter on the docket

20  because Judge Lane's order in ECF Case Number 22-10910,

21  Docket Entry 86 at Page 3 required Epiq to exclude data

22  sharing arrangements with XCLAIM and its retention.  And the

23  retention order was signed on July 29th.  But as I say, in

24  Epiq's disclosure in this case at Paragraph 16 in ECF Docket

25  Number 12 it says, "Epiq cease providing data to XCLAIM in

1    the Madison Square case on August 17th, 2022."  So you need

2    to address very clearly in a supplemental filing whether

3    Epiq continued to provide XCLAIM with data between July 29th

4    and August 17 because your disclosure says it stopped on

5    August 17th.

6              MR. O'CONNOR:  We will do that, Your Honor.

7              THE COURT:  Okay.  Anybody else wish to be heard?

8              MR. O'CONNOR:  Thank you, Judge.

9              THE COURT:  Thank you very much.

10             MR. MOSKOWITZ:  Good afternoon, Your Honor.

11   Elliott Moskowitz from the law firm of Davis Polk &

12   Wardwell.  It's very good -- on behalf of Donlin Recano.

13   And it's --

14             THE COURT:  I've only seen you on a screen.

15             MR. MOSKOWITZ:  Exactly.  It's -- I look taller on

16   the screen.  But it's a pleasure to see you in person, Your

17   Honor.

18             This isn't an orthodox request, but could I have

19   like 30 seconds to confer with the U.S. Trustee?  It may

20   sharpen or may narrow some of the issues in play just for

21   the moment.

22             THE COURT:  Sure.

23             MR. MOSKOWITZ:  Okay.  Thank you very much, Your

24   Honor.  Just a moment.

25             THE COURT:  Go ahead and do that.  If you want to

```
1    step out in the hall and do it.

2           MR. MOSKOWITZ:  Literally just a minute.

3           THE COURT:  Go ahead.  It's okay.

4           MR. MOSKOWITZ:  Thank you, Your Honor.

5           (Recess)

6           THE COURT:  Mr. Moskowitz, go ahead.

7           MR. MOSKOWITZ:  I was unsuccessful.  I think.  I

8    think.  Or it's incomplete perhaps.  So let me just put it

9    out there, Your Honor, if I may, since we have a discovery

10   matter.

11          THE COURT:  Mr. Levin, it would be -- it's

12   impolite to --

13          MR. LEVIN:  Sorry.  I didn't realize they were

14   back, Your Honor.  Sorry.

15          MR. MOSKOWITZ:  All right.  So, Your Honor, I just

16   think it's helpful for the record, just because there's been

17   a lot of colloquy today already, just to really set out very

18   clearly what I think has been provided already versus what I

19   think folks are fine with providing versus what maybe seems

20   to be not relevant to the proceedings.  And I'm not even

21   sure if the U.S. Trustee is even asking for it.  That's why

22   I tried to clarify.  And to be sure, we shared some of Mr.

23   Levin's confusion with regard to the exact posture of

24   whether we had a live discovery request.  Our client did

25   reach out to the U.S. Trustee's Office after that original
```

1 letter came in in order to meet and confer after it was

2 rebuffed. And that's fine. We're here today and everything

3 is copasetic and we're here to resolve whatever the

4 discovery dispute is right now.

5        So, Your Honor, just so we're all clear, all of

6 the -- and maybe I'm the only one in the court that needs to

7 clarify this. But all of the claims agents have already

8 provided data nationwide with respect to cases nationwide

9 identifying all the cases nationwide in which they receive -

10 - in which they provided data to XCLAIM, number one,

11 regardless of whether they received a payment or not with

12 respect to that case.

13        And then also every dollar that they receive from

14 XCLAIM. Because --

15        THE COURT: But not the issue of the compensation

16 they received as claims agent in the case. That's --

17        MR. MOSKOWITZ: Correct. What they have not

18 provided so far -- and I agree with everything that's been

19 said about the burden point. It's all public anyways. I'm

20 sure we can package it and that's fine. But just to be

21 clear, what we have not provided is data in those cases with

22 respect to what compensation the claims agent received

23 either in the 156 capacity or in the 327 capacity as

24 applicable. That's what's not been provided and that's what

25 could be provided.

1          In the case of Donlin Recano, that would be 27

2      instances since 2019.  And then as we set forth in our

3      submission, we already told them how much we got from that.

4      I think it's about $2,000 nationwide.

5          What I think is not --

6          THE COURT:  $2,115.28.

7          MR. MOSKOWITZ:  Thank you, Your Honor.  What is

8      not I think clear and I think is not relevant though if the

9      U.S. Trustee is pressing for this, is at least according to

10     the literal terms of the request -- and I was unable to

11     elicit clarification on this -- they seem to be asking for

12     more than that.  I think what they're asking for is every

13     case in the last five years regardless of whether or not

14     data was transmitted to XCLAIM.  So in other words, in the

15     hundreds and hundreds of cases in which no data was

16     transmitted to XCLAIM, they nonetheless want in those cases

17     all the amounts paid to the claims agents under 156 and 327.

18     And then they want it also for five years even predating the

19     XCLAIM agreements.  If that is what they want, I think

20     there's a strong relevance objection.  If they don't want --

21          THE COURT:  Let me ask you this question.  Did

22     Donlin Recano transmit claims data to XCLAIM in those cases

23     and it just happened that there was no claims trading so you

24     didn't receive the percentage fee?

25          MR. MOSKOWITZ:  No.  So obviously Donlin Recano

1  has worked in many, many, many dozens of cases.  Only in 27

2  cases was data shared with XCLAIM.  With respect to seven of

3  those cases was there a fee that was earned, two of which

4  were in the Southern District of New York.  And the total

5  fee amount nationwide is about $2,100.  And then in the

6  Southern District of New York, it's I think in the order of

7  $500.

8           But my point is I believe them to be asking -- and

9  they can take this down today if they want to, but I believe

10  them to be asking for data outside those XCLAIM data cases.

11  And if that's what they're asking for, I don't see that as

12  relevant to these proceedings.

13           THE COURT:  Well, I'll ask Ms. Wells.

14           MR. MOSKOWITZ:  Okay.

15           THE COURT:  It's a fair point you're raising.

16           MR. MOSKOWITZ:  Thank you, Your Honor.

17           THE COURT:  Ms. Wells, why don't you go up to the

18  microphone?

19           MR. MOSKOWITZ:  And I have a second point to make

20  that I could make --

21           THE COURT:  Okay, then make your second point.

22           MR. MOSKOWITZ:  Okay, thank you.  And then, Your

23  Honor, I just want to echo the points that have been made by

24  the other claims agent's counsel so far with regard to what

25  this proceeding -- to whether this proceeding can be

1    determined on the record that's before the Court.  Again, no

2    problem waiting a number of days for this additional data to

3    -- on fees to be provided.  Again, I can make arguments with

4    respect to the relevance, but it's really not a big deal to

5    provide that.  And so that's fine.

6            What I would say though is that we've all laid out

7    in our briefs that it's a bad faith standard that's a gating

8    issue to whether or not a sanction can issue here.  If the

9    Court does --

10            THE COURT:  Go ahead.

11            MR. MOSKOWITZ:  If the Court does conclude that

12    the agents did not act in bad faith, then I don't believe

13    that, at least as far as we've seen in the caselaw under the

14    Court's inherent authority to sanction, that a sanction

15    should issue.

16            And so for us, again, we can complete the record

17    as has been suggested, but I think even with completing the

18    record, no matter what that additional data shows, I do not

19    believe that there is going to be a record that would give

20    the Court cause to find that the agents acted in bad faith.

21            THE COURT:  So your focus is on the sanctions

22    regime and the theories for which bad faith is required to

23    be shown.  You can argue now or argue at a subsequent

24    hearing, but the Southern District's protocol for claims

25    agents says, you know, retention of claim agents "should be

1    limited in scope to those duties that will be performed by

2    the clerk of the court," and then it goes on, "should

3    exclude those duties that would not be performed by the

4    clerk of the court." And the approved claims agent "has a

5    duty to comply with all relevant statutory provisions and

6    rules of procedure, including local rules of procedure,

7    general orders, and applicable guidelines." That's

8    Paragraph 3 of the protocol.

9            And it goes on to say that claims agents are put

10   on notice that failure to comply "with the duties" in the

11   Southern District's protocol "may lead to removal" from the

12   clerk of the court's list of approved claims agents.

13           So an issue for the Court is whether each or any

14   of the claims agents should be removed from the list of

15   approved claims agents. You are free to argue that in

16   making that determination, the Court should apply, must

17   apply, may apply the standards for sanctions generally. I

18   don't read it that way. When we set out in the guidelines

19   here are the rules you've got to follow, and if you don't,

20   "may lead to removal." You know, frankly, that's the death

21   sentence. Okay?

22           And, you know, don't take too much comfort, but

23   I'm not a big fan of the death penalty. Okay? But I

24   understand the arguments that have been made about the

25   standard for sanctions, but be clear, I don't view that as

1  the standard for removal of a claims agent from the approved

2  list.

3        MR. MOSKOWITZ:  Fully understood, Your Honor.  And

4  I think the reason why the briefing was directed at the bad

5  faith standard for the Court's inherent authority is just

6  simply everyone was reacting to the orders of the court

7  themselves, which refer to issuing sanctions.

8        THE COURT:  Well, in a way, removing somebody from

9  the approved list is a sanction, too, but it's different.

10       MR. MOSKOWITZ:  Agreed.  And I certainly agree

11  with the Court's characterization of it being a death

12  sentence, a drastic -- a remedy that -- when the time comes,

13  we would be happy to argue --

14       THE COURT:  And just to be crystal clear, because

15  I sometimes read things on 360 bankruptcy and elsewhere, by

16  making a statement that it's the death sentence, yes, it

17  would be.  That's -- you know, I really don't want to do

18  that.

19       MR. MOSKOWITZ:  Fair enough, Your Honor.  Let me

20  just conclude by saying that whether you're looking at the

21  caselaw that talks about bad faith with respect to the

22  inherent authority point or whether Your Honor is looking at

23  the protocol and the consequences of a violation of the

24  protocol and what that should be, either way, I share the

25  views of the other claims agents' counsel that Your Honor

1  has a record or will certainly soon have a record that will

2  enable Your Honor to render a judgement on that.

3          And I will just mention that we too are suffering

4  from the overhang of this proceeding and would prefer of

5  course that it be resolved expeditiously.

6          THE COURT:  Who if the beneficiary of the

7  proceeding?  Never mind.  Let's...

8          MR. MOSKOWITZ:  Maybe our competitors.

9          THE COURT:  Let's leave it at that.

10          MR. MOSKOWITZ:  If I may.  But that doesn't serve

11  anyone necessarily.

12          THE COURT:  Okay.

13          MR. MOSKOWITZ:  And thank you, Your Honor, for

14  hearing me.

15          THE COURT:  Thank you.  Does anybody else wish to

16  be heard?

17          MR. CLAREMAN:  Good afternoon, Your Honor.  Billy

18  Clareman from Paul Weiss on behalf of Omni.

19          I'll start by addressing the discovery point.  You

20  may --

21          THE COURT:  You know what?  I'll let Mr.

22  Woolverton (indiscernible).  Go ahead.

23          MR. CLAREMAN:  He would say it better than I can

24  I'm sure.

25          But I want to start with addressing the discovery

1    issue.  You may have concluded by process of elimination

2    that Omni was the agent that has engaged with the Office of

3    the U.S. Trustee about their discovery requests.  And we

4    provided yesterday information to the U.S. Trustee in the

5    form of a spreadsheet that specified for each of the cases

6    that were reflected in the Exhibit C to Omni's initial

7    submission the fees that were earned in each of those cases

8    under 156(c) and 327.  So we provided that information.  It

9    was not difficult to provide.  And so in the interest of

10   trying to be constructive and move this process forward, we

11   provided that information to them.  That was not coupled

12   with a concession that the information that we were

13   providing was actually relevant to the proceeding.

14            THE COURT:  I understand.

15            MR. CLAREMAN:  Which I'm sure Your Honor

16   understands.  But I do -- I think an important point in

17   terms of how we are evaluating this is the proportionality

18   principle.  Because I do think that that's relevant to

19   issues like discovery, but it's also relevant to the issue

20   ultimately of sanctions, which was the subject matter of

21   this hearing.

22            As set forth in our papers, Omni had an agreement

23   with XCLAIM.  It provided data to XCLAIM under those

24   agreements.  As soon as Omni learned that there was a

25   question raised by Judge Beckerman in the Pareteum

1  bankruptcy case, it terminated its agreement with XCLAIM

2  immediately.  Didn't wait.  It did it right away.

3      During the course of its engagement with XCLAIM,

4  Omni received statements from XCLAIM specifying the trades

5  that had happened in the cases for which Omni was agent.

6  According to those statements, there were a total of 16

7  trades associated with $1,000 in fees.  They were actually

8  never paid.

9      THE COURT:  I actually have it in my notes that

10  Donlin did not receive this payment, will not be seeking

11  payment from XCLAIM.

12      MR. CLAREMAN:  Omni, yes.

13      THE COURT:  Omni, I'm sorry.

14      MR. MOSKOWITZ:  (indiscernible) as to Donlin as

15  well.

16      THE COURT:  Yeah, I'm sorry.  We wish.

17      MR. CLAREMAN:  But I do think that's relevant

18  because ultimately even if the principle that is -- and the

19  analysis from Judge Lane is upheld on appeal before Judge

20  Failla, even if there were to be a sanction that were to be

21  evaluated, disgorgement would be the natural remedy.  It is

22  a proportional remedy.  And in this case, there's nothing to

23  disgorge.  The contracts have been terminated, there's no

24  further performance under them, there's no data being

25  provided to XCLAIM at this point.

1          And so I would submit that the matter can be

2    resolved on the existing record for that reason.

3          THE COURT:  From my standpoint -- and each judge

4    in this court will decide for him or herself -- is Omni or

5    the other claims agent's retention in future cases going to

6    be approved or are they going to be removed from the

7    approved list of claims agents, yeah, I think the amount for

8    the pass is relevant as well.

9          Let's save this for when -- I will schedule a

10   hearing promptly after the record is complete and closed.

11   Okay?

12         MR. CLAREMAN:  Thank you, Your Honor.

13         THE COURT:  All right.  Anybody else?  Ms. Wells,

14   anything you want to add?  I'm sorry.

15         MR. LEVIN:  Your Honor, just quickly, just to

16   address the disgorgement issue.  I believe Epiq is the only

17   claims agent that has not disgorged the fees that it

18   received, and I just want to make sure that it's on the

19   record that we did state in our brief that Epiq is prepared

20   to disgorge those fees.  Thank you.

21         THE COURT:  Thank you.  Ms. Wells, anything you

22   want to add?

23         MS. WELLS:  Again for the record, Annie Wells on

24   behalf of the United States Trustee.

25         I'm going to start, just because I think it's low-

1    hanging fruit, in terms of the discovery that we are looking

2    for, if you will, for lack of a better term.

3           I think the example that Donlin gave before and in

4    their paper was, you know, since entering into the XCLAIM

5    agreement, they had transmitted data to XCLAIM in I believe

6    28 cases, and there were nine trades resulting from those 28

7    cases.  What we're getting at, the requested information is

8    not just -- well, let me just actually start with we had

9    talked about the five years before.  It doesn't have to be

10   the five if it turns out, you know, nothing happened prior

11   to 2018.

12          But the number of cases I thought is what Mr.

13   Moskowitz is getting at, which is even if Donlin only

14   transmitted data in 28 cases, but for the period for which

15   they had an arrangement with XCLAIM, let's say they acted as

16   an agent in either 156 or 327 capacity in let's say 56

17   cases, right?  But only 28 of those resulted in some data

18   being transferred either because maybe the other cases were

19   small, nobody cared about the data, whatever it is.

20          It's important for us to know, and I think for the

21   Court because we are, again, looking at it from a disclosure

22   issue, is they did not disclose or did they disclose in all

23   56 cases their relationship and their contract agreement

24   with XCLAIM, right?  So we know about the 28 where they

25   transmitted the data.  But that just means there may be

1  other cases --

2          THE COURT:  Your point is there were 56 cases in

3  which they were the claims agent --

4          MS. WELLS:  Correct.

5          THE COURT:  -- during the periods in which it had

6  a contract with XCLAIM, whether they transmitted the data or

7  not.

8          MS. WELLS:  Correct.  Correct.  So it's not --

9          THE COURT:  And I think that data should be --

10  it's still, you know, 56 is not a huge number.  It's going

11  to be a relatively simple matter for them or any of the

12  claims agents to provide information about the number of

13  cases that -- in which it was a claims agent during a period

14  in which it had a contract with XCLAIM.  And I'm assuming

15  that there were no other trading platforms, if you will,

16  doing the same thing that we're paying -- you know, I'm

17  focusing on XCLAIM because it's the only one I'm aware that

18  was providing compensation to claims agents.  If I'm wrong,

19  tell me.

20          MS. WELLS:  So I just wanted to be clear that

21  that's what we meant.  It wasn't necessarily tied to a time

22  period, but the scope of their representations in all of

23  their capacities.

24          But I also wanted to get back to something that

25  Mr. Levin had said before.  And I think he started out with,

1    when I rose earlier, you know, when Your Honor started with

2    the information is relevant to the judges here to know what,

3    you know, the retentions and the relationships even in other

4    districts.  And I believe the way Mr. Levin phrased it was

5    it would really only be relevant in those cases and not in

6    the miscellaneous proceeding.  And I would --

7             THE COURT:  It's relevant.  This miscellaneous

8    proceeding is determining what if anything, sanction or

9    removal from the approved list should result from what's

10   happened in the past.  Simplify it by just saying that.  So

11   that's why.

12            MS. WELLS:  Okay.  So I won't belabor that point.

13            The second point that I wanted to respond was,

14   again, just to clarify because I thought it was addressed,

15   whether this is treated as a discovery dispute or not.  I

16   think the label or the term is less important so much as in

17   terms of what is actually going to happen in the case.

18   Again, to be clear, we would want an order so that parties

19   are not confused about what they have to produce, when they

20   have to produce it.

21            THE COURT:  Let me just (indiscernible).  Submit a

22   proposed order.  Circulate it among counsel today.  And you

23   ought to be able to come up with an greed form of order so

24   that there's no misunderstanding about what's required.

25   Okay?

1          MS. WELLS:  Thank you, Judge.

2          THE COURT:  And I'll just say the sooner all of

3    this is done, I'll schedule another hearing and we'll get

4    this all resolved.  Okay?  Go ahead, Ms. Wells.

5          MS. WELLS:  Okay.  Lastly, when I had rose the

6    first time, it was really to -- because we started the

7    process with the discovery dispute again, if you will.  So I

8    had not gone into the substance of the pleadings, although

9    that sort of started to spill over as the claims agents came

10   up and (indiscernible) idea.

11         They are correct in that almost all of the papers

12   from the claims agents uniformly couched or framed the

13   inquiry as to whether there should be sanctions warranted is

14   was there any bad faith.  And I want to note from our

15   perspective and from the Code's perspective in the cases

16   that we've cited dealing with non-disclosure and violations

17   of 327 and 2014 and disgorgement cases, you know, bad faith

18   -- most of the time, professionals who fail to disclose is

19   not for some nefarious reason.  Right?  It's not because

20   they can represent a committee member at the same time they

21   represent a committee and gain some tactical advantage.

22   It's almost always just they didn't disclose it because they

23   felt it wasn't necessary or they didn't need to.  And I

24   would submit, Your Honor, that that in itself is a violation

25   and that in itself is a harm to the court and the bankruptcy

1 process because I think it takes away the Court's ability to

2 determine whether a connection needs to be disclosed,

3 whether it has any relevance to the particular case. It's

4 absolutely --

5        THE COURT: Well, Judge Lane's opinion was pretty

6 clear about the requirement, the connection, unless he's

7 reversed.

8        MS. WELLS: Right. I would submit that, you know,

9 bad faith is not in the context of a violation of 327 or

10 329. It's a separate issue than the one that they are

11 arguing, and also separate from the protocol and the

12 guidelines under 5075.

13        And then lastly with respect to bad faith, we did

14 ask in addition to a list of scheduled cases and fees, we

15 did ask for a designated person who we can follow up on and

16 inquire. Because I think notwithstanding the claims that

17 there was no bad faith -- and I'm not saying that there was.

18 What I'm saying is we don't know because there's no -- we

19 don't have any information or any transparency as to what --

20        THE COURT: Let me stop you there. I am going to

21 require each of the claims agents designated the responsible

22 person. If you want to take their depositions, you can. I

23 mean, I thought I heard already, well, we've done that

24 already effectively. But just so there's no mistake. Put

25 that in the proposed -- in the order so there's no ambiguity

1   about it.  Okay?

2            MS. WELLS:  Okay.  Thank you, Your Honor.

3            THE COURT:  All right.  The Court is adjourned.

4   We're going to set a date -- you know, get this all in.

5   Don't look -- why are you looking so mystified, Mr. Levin?

6            MR. LEVIN:  Your Honor, I just wanted to clarify

7   that at this continued hearing, we're going to have an

8   opportunity to argue the substantive points that have been

9   raised on the --

10           THE COURT:  You are.

11           MR. LEVIN:  Okay, thank you.

12           THE COURT:  I am going to schedule a hearing.  The

13  sooner you get the record closed, the sooner you'll get a

14  hearing date.  I probably will allow a short time, and you

15  can start planning it now, if you want to submit

16  simultaneous closing briefs addressing any issues.  And

17  you'll have a chance to argue.  Okay?

18           MS. WELLS:  And, Your Honor, we haven't even -- we

19  just said we (indiscernible).

20           THE COURT:  We'll -- I'm going to give -- if you

21  want to try and put in the order schedule with dates, great.

22  When the briefs are going to be -- you know, when the

23  discovery is going to be complete, when final briefing will

24  be done, and you'll get a date from Deanna for a hearing

25  date for argument.

1          MR. LEVIN:  Your Honor, it would be helpful to

2     know approximately how much time between briefs and the

3     hearing.  I know it's not one day, but how many days do you

4     need?

5          THE COURT:  A week.

6          MS. WELLS:  Between the brief and the hearing.  In

7     between you getting the final brief is what --

8          THE COURT:  Yes, yes.

9          MS. WELLS:  Okay.  I'm just trying to follow it.

10          MR. MOSKOWITZ:  Your Honor, just so we're not --

11     just...

12          THE COURT:  Go ahead.  Go up to the microphone.

13     There are people listening virtually.

14          MR. MOSKOWITZ:  For the record, Elliott Moskowitz

15     at Davis Polk.  Just so we don't have to bother Your Honor

16     again with the discovery dispute, is it clear enough that we

17     should go back only until the time such that an XCLAIM

18     agreement existed versus going back in time further into the

19     past?

20          THE COURT:  Ms. Wells?

21          MS. WELLS:  Or some other similar -- I mean, yeah

22     --

23          THE COURT:  What do you mean, similar?

24          MR. MOSKOWITZ:  Or any agreement.

25          MS. WELLS:  There are no other third-party trading

```
 1   platforms at issue other than XCLAIM and no prior --

 2            THE COURT:  Yes.  Go back to you getting with

 3   XCLAIM, okay?

 4            MR. MOSKOWITZ:  Thank you, Your Honor.

 5            THE COURT:  All right.  Somebody is rising.

 6            MR. GLANTZ:  Your Honor, if I may.

 7            THE COURT:  Wait until you get to the microphone,

 8   make your appearance.

 9            MR. GLANTZ:  Hi, Your Honor.  Andrew Glantz,

10   internal counsel for XCLAIM.  Before I speak --

11            THE COURT:  You're not before me today.

12            MR. GLANTZ:  I know that.  I'm just here to ask if

13   it's possible --

14            THE COURT:  I don't even want to hear from you.

15            MR. GLANTZ:  Okay.  That's all I wanted to ask, if

16   it was possible to make two --

17            THE COURT:  You're not a party to this proceeding.

18            MR. GLANTZ:  I understand that.  I'm only asking

19   if I can --

20            THE COURT:  You're not a party to this proceeding.

21            MR. GLANTZ:  I've heard that.  Thank you, Judge.

22   Thank you.

23            THE COURT:  You had your counsel appear before me

24   before, and a decision will be issued in due course.  We are

25   adjourned.
```

1          (Whereupon these proceedings were concluded at

2     4:02 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 18, 2022